**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TOM DUNNE, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:16 CV 1351 DDN |
| | ) | |
| RESOURCE CONVERTING, LLC, | ) | |
| TIM DANLEY, | ) | |
| RICK KERSEY, | ) | |
| SEBRIGHT PRODUCTS, INC., | ) | |
| GARY BRINKMANN, | ) | |
| NEWWAY GLOBAL ENERGY, LLC, | ) | |
| DAVID WOLF, | ) | |
| JERRY FLICKINGER, and | ) | |
| JWR, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER GRANTING IN PART AND
## DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

This is the second round of motions to dismiss plaintiff's claims. In late 2016, defendants moved to dismiss plaintiff's original complaint (ECF No. 1), and the parties argued these motions at a February 2017 hearing. (ECF No. 106). The court dismissed all claims in plaintiff's original complaint for failings under Federal Rules of Civil Procedure 9(b) and 12(b)(6). (ECF No. 107). However, the court gave plaintiff leave to amend these claims, and plaintiff filed an amended complaint on March 15. (ECF No. 113). Defendants have again filed motions to dismiss on the same or similar grounds.

Defendants Sebright Products, Inc. and Gary Brinkmann move to dismiss Counts I, III, IV, V, VII, and VIII, (ECF No. 122); defendants Tim Danley and Rick Kersey move to dismiss Counts I, III, IV, V, VII, VIII (ECF No. 124); defendant NewWay Global Energy, LLC, moves to dismiss Counts III, V, and VIII (ECF No. 127); defendant David Wolf moves to dismiss Counts I, III, IV, V, VI, VII, and VIII (ECF No. 129);

defendants Jerry Flickinger, and JWR, Inc., move to dismiss Counts VI, VII, and VIII (ECF No. 129); and defendant Resource Converting, LLC, moves to dismiss Counts I, II, III, IV, V, and VII. (ECF No. 135). Plaintiff has opposed all motions. (ECF Nos.140-44). The court grants defendants' motions in part; in all other respects, they are denied.

## I. BACKGROUND

Plaintiff Tom Dunne alleges the following facts in his amended judicial complaint. (ECF No. 113). At all times relevant to the cause of action, Danley was vice-president of business development at Resource, Kersey was the chief executive officer of Resource, and both, along with Wolf and Flickinger, were corporate representatives of NewWay. (*Id.* at ¶ 5, 11). Brinkmann was and is the director of multinational sales at Sebright. (*Id.* at ¶ 7). Wolf was also the chief executive officer of JWR and Flickinger was also a corporate representative of JWR. (*Id.* at ¶ 13).

In May 2015, Brinkmann contacted plaintiff to sell him certain license agreements. (*Id.* at ¶ 18). He allegedly hoped to sell plaintiff one million dollars' worth of licensing rights. (*Id.* at ¶ 18). These agreements would give plaintiff "exclusive rights within the 100-mile radius of St. Louis to sell a non-thermal, pulverizing, and drying system technology (the 'PAD System'), which, upon information and belief, was licensed by Resource from the original inventors of the technology." (*Id.* at ¶ 19). The PAD System, when combined with other technologies designed and built by defendants Sebright, JWR, and NewWay, would purportedly convert municipal solid waste to renewable fuels. (*Id.* at ¶¶ 20-21).

Approximately a week after his initial contact, on May 27, 2015, Brinkmann sent plaintiff a brochure entitled "Waste Conversion Systems with Proven Capabilities." (*Id.* at ¶ 27, Ex. A). The brochure depicted the logos of JWR, Sebright, NewWay, and Resource, and described the Waste Conversion System as the combination of a vertical shaft impactor made and sold by Sebright, the PAD System sold by Resource and NewWay, and products provided by JWR to convert the waste to fuel. (*Id.* at ¶¶ 28-29, Ex. A). The brochure stated that Sebright, Resource, and JWR "will provide a system

2

using proven and tested equipment" to create a homogenous dried fuel stock capable of conversion into different energy forms. (*Id.* at ¶ 30, Ex. A). The defendants knew plaintiff needed a product that would effectively and economically convert municipal solid waste to biofuel, and the brochure specifically identified municipal solid waste as a "Common Feedstock Used to Make Biofuels and Renewable Fuels." (*Id.* at ¶ 31, Ex. A).

On June 22, 2015, Brinkmann sent an excel spreadsheet to plaintiff that demonstrated the production levels and functionality of the PAD System, including profit potentials. (*Id.* at ¶¶ 35-36). Plaintiff alleges that this spreadsheet "was formed with input" from all other defendants. (*Id.* at ¶ 35).

On August 12, 2015, Flickinger sent an email to plaintiff with a "budgetary quote for a single line processing system to take municipal solid waste and prepare it for conversion to fuel." (*Id.* at ¶ 37, Ex. B). This email was sent from Flickinger's JWR address on behalf of NewWay, Resource, and JWR, and plaintiff alleges it was formulated with input from all defendants. (*Id.* at ¶ 37-38, Ex. B). This email stated that the Waste Conversion System was "the most efficient system available anywhere to achieve a desired output, to be accomplished by mating together existing, PROVEN technologies into a comprehensive turnkey system," and it could process 15 tons of municipal solid waste an hour, with a discharge capacity of 6 tons per hour. (*Id.* at ¶¶ 39-41).

Plaintiff alleges that between May 26 and August 31, all defendants but Wolf orally assured plaintiff numerous times that the OAD System functioned as represented in the written materials. (*Id.* at ¶ 58). Between August 12 and August 21, 2015, plaintiff alleges that "Brinkmann, Sebright, Flickinger, JWR, Kersey, Danley, NewWay, and Resource further represented that these capacities and capabilities would be achieved without using thermal systems to dry the feedstock materials." (*Id.* at ¶ 42). Plaintiff alleges that the use of thermal drying systems would be too costly and inefficient to market. (*Id.* at ¶ 42).

On August 18, 2015, Brinkmann forwarded an email to plaintiff from Danley, which stated that the PAD System would generate "millions of dollars" over the 20-year

period of the license agreements. (*Id.* at ¶ 44). The next day, plaintiff met with Brinkmann and Flickinger to discuss the cost of a PAD System, which plaintiff would be required to purchase as part of the license agreements. (*Id.* at ¶ 45). This discussion was confirmed in a post-meeting email later that day, which listed the cost of a PAD System with a 7 ton/hour capacity at $3.2 million, and a System with a 14 ton/hour capacity at $5 million. (*Id.* at ¶ 47). The email gave plaintiff a deadline of August 21, 2015, to execute five license agreements, requiring payments of $200,000 per license agreement. (*Id.* at ¶¶ 48-51). The email emphasized that if plaintiff did not sign by August 21, 2015, he risked losing the opportunity to enter into any agreements. (*Id.* at ¶ 51).

Brinkmann also orally informed plaintiff in the weeks leading up to August 21 that there were other individuals in the area ready and willing to enter into the agreements if plaintiff did not do so. (*Id.* at ¶ 52). Brinkmann sent an additional email on August 19 describing the profit percentages of the PAD Systems and stressing the urgency of meeting the August 21 deadline. (*Id.* at ¶ 53). Danley sent an email on August 19 as well, detailing the payment structure and timeline for the license agreements and emphasizing the necessity of signing the agreements by August 21. (*Id.* at ¶ 54). Danley sent this email on Resource letterhead and copied Kersey and Brinkmann. Plaintiff alleges that there were representations between May 26 and August 31 that other individuals were ready and willing to enter into the license agreements if plaintiff did not, and there were many other individuals nation- and world-wide entering into similar license agreements. (*Id.* at ¶ 59).

Defendants did not fully reveal to plaintiff the exact nature of the relationships and agreements between themselves, including details about sales proceeds or commissions. (*Id.* at ¶ 22). The individual defendants appeared to act at times on their own behalf but at other times on behalf of one or more of the corporate defendants. (*Id.* at ¶ 22). Although the license agreements were to be made with Resource, plaintiff alleges that each of the defendants was positioned to benefit in some way from their execution, either as members of Resource or its member LLCs, as companies owning the other components of the waste conversion technology to be used in conjunction with the PAD

System, or as members of those other companies. (*Id.* at ¶ 23). Defendants allegedly knew that plaintiff had experience in the waste and landfill industry and intended to exploit his contacts. (*Id.* at ¶¶ 25-26).

On August 21, 2015, plaintiff executed all five license agreements. (*Id.* at ¶ 55, Ex. C). Danley executed the license agreements on behalf of Resource and its successors, assigns, and affiliates. (*Id.* at ¶ 56). On August 31, plaintiff made a $400,000 payment to Resource for the first two license agreements. By the terms of the license agreements, he was to pay an additional $600,000 by November 2015. Between August 21 and November 31, Resource, Sebright, JWR, NewWay, Brinkmann, and Flickinger continued to advertise the PAD Systems to plaintiff with repeated assurances of the "proven" abilities of the PAD Systems and touting the substantial value of the license agreements. (*Id.* at ¶ 63).

Between August 10 and October 22, plaintiff accompanied Brinkmann and Flickinger, who were acting on behalf of Sebright and JWR, respectively, as well as Resource and NewWay, on "sales calls" to plaintiff's contacts in the St. Louis area. (*Id.* at ¶ 63, Ex. D). At these sales calls, Brinkmann and Flickinger advertised the Waste Conversion System on behalf of NewWay, Resource, Sebright, and JWR, continuing to represent that the PAD System would process municipal solid waste at the capacities previously represented to plaintiff. (*Id.* at ¶ 64). At the request of "all" defendants, plaintiff scheduled, facilitated, and attended these sales calls and similarly advertised the PAD system. (*Id.* at ¶ 65).

From early August 2015, plaintiff had insisted upon seeing a functioning, operational PAD System in order to verify defendants' representations to him. (*Id.* at ¶ 66). On several occasions, all defendants but Wolf assured plaintiff they would show him a PAD System demonstration. (*Id.* at ¶ 66). At Brinkmann's encouragement, plaintiff attended an energy conference in September 2015 in Des Moines, Iowa. (*Id.* at ¶ 68). In a September 14 email, Brinkmann assured plaintiff he would see a fully-functioning PAD System while attending the energy conference in Iowa. (*Id.* at ¶¶ 68-69). However, when Brinkmann, Flickinger, Kersey, and Wolf took plaintiff into a barn

for that purpose on September 22, they only showed plaintiff a partially-assembled piece of nonfunctioning equipment. (*Id.* at ¶ 70).

Plaintiff alleges that this demo equipment was never a fully-functioning PAD System even when fully assembled, but rather a demonstration system not intended for production purposes and incapable of producing at the capacity represented to plaintiff. (*Id.* at ¶ 71). Plaintiff alleges that Kersey, Danley, Resource, and NewWay knew this fact and the remaining defendants should have known of this fact, but all defendants "either failed to disclose this fact or actively concealed this fact from plaintiff." (*Id.* at ¶ 71).

Plaintiff continued to request the demonstration of an operational, successful PAD System. (*Id.* at ¶ 72). Despite verbal assurances from "defendants," they failed to provide plaintiff with evidence of the System's functionality, and plaintiff became suspicious about the PAD System's existence and operation. (*Id.* at ¶ 72-73). Plaintiff demanded a meeting in November 2015 to discuss the PAD System's functionality. (*Id.* at ¶ 74). On November 18, Flickinger, "on behalf of all named defendants," forwarded an email to plaintiff answering a series of questions plaintiff had posed about the PAD System and its profit potential. (*Id.* at ¶ 75). The email assured plaintiff that Resource had licensed the PAD System to more than twenty licensees around the world. (*Id.* at ¶ 76). The email also informed plaintiff he would need to remit the remaining $600,000 payment to either Resource or NewWay. (*Id.* at ¶ 77). Plaintiff alleges that all named defendants provided input in some capacity to this email. (*Id.* at ¶ 75).

Between August 21 and November 2, Brinkmann and Flickinger, "on behalf of all named defendants" used a third-party's research on waste-to-fuel development at a Polish biofuel plant in an effort to legitimize the PAD System. (*Id.* at ¶ 79). Defendants used this third-party's reports and updates to mislead and distract plaintiff, as well as convince him that there was a market for the PAD System and the defendants' broader Waste Conversion System. (*Id.* at ¶ 80). Plaintiff alleges this was false and misleading given the alleged functional limitations and inefficiencies of the PAD System. (*Id.* at ¶ 80).

On November 30, all defendants traveled to St. Louis, Missouri, to meet with plaintiff as he had requested. (*Id.* at ¶ 81). Plaintiff alleges that as of November 30,

defendants had yet to provide any evidence, proof, or demonstration of the PAD System's ability to function at the capacities defendants had represented. (*Id.* at ¶ 82). At the meeting, plaintiff offered to pay the remaining $600,000 into escrow, pending defendants' live demonstration of an operational PAD System functioning as represented. (*Id.* at ¶ 83). However, defendants declined this offer and refused to provide evidence that the PAD System worked as had been represented. (*Id.* at ¶ 84).

Plaintiff alleges that defendants' activities "induce[d] plaintiff to expend his professional time, expenses, his professional industry contacts, and other resources in furtherance of this transaction." (*Id.* at ¶ 85). On December 1, "defendants" demanded full payment of the remaining $600,000 be sent to Resource instead of NewWay. (*Id.* at ¶ 86). Plaintiff alleges that defendants' continued misrepresentations delayed plaintiff's discovery of the truth and prevented him from recovering the $400,000 he was induced to pay in August 2015. (*Id.* at ¶ 87).

Brinkmann made efforts to reconcile with plaintiff on behalf of Sebright, by attempting to put together a different version of a Waste Conversion System not involving the PAD System. (*Id.* at ¶ 89). Plaintiff alleges that Brinkmann "expressed regret about the deficiencies and the tactics surrounding the license agreements [and] the PAD System and offered another business opportunity as a means of recouping plaintiff's losses." (*Id.* at ¶ 89). Brinkmann and plaintiff continued to make sales calls through January 2016 with this goal in mind, and in June 2016, Brinkmann ultimately admitted to plaintiff in a phone call that the PAD Systems never existed in the form and function represented by defendants or could never have performed as promised by defendants. (*Id.* at ¶ 91). Brinkmann informed plaintiff in this phone call that he had just witnessed Kersey and Danley trying to sell the PAD Systems at an energy conference in Las Vegas, Nevada under the new name "The Dryclone," "once again representing the system as patented, trademarked, and 'proven' in the same manner they had previously, falsely represented to plaintiff." (*Id.* at ¶ 92). Plaintiff alleges that all the acts of every defendant were undertaken in furtherance of fraud, misrepresentation, and conspiracy. (*Id.* at ¶ 88).

## II.    MOTIONS TO DISMISS

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss part or all of a case for its failure to state a claim upon which relief can be granted.  Fed. R. Civ. Pro. 12(b)(6).  A complaint "must include enough facts to state a claim to relief that is plausible on its face," providing more than just labels and conclusions.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Such a complaint will "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and will state a claim for relief that rises above mere speculation.  *Twombly*, 550 U.S. at 555.

In reviewing the pleadings under this standard, the court accepts all of the plaintiff's factual allegations as true and draws all inferences in the plaintiff's favor, but the court is not required to accept the legal conclusions the plaintiff draws from the facts alleged.  *Retro Television Network, Inc. v. Luken Commc'ns, LLC,* 696 F.3d 766, 768-69 (8th Cir. 2012).

Finally, a court sitting in diversity will apply the choice-of-law rules of its forum state.  *Eagle Tech. v. Expander Americas, Inc.*, 783 F.3d 1131, 1137 (8th Cir. 2015).  In this case, the court has determined that the substantive law of Missouri provides the substantive rules of decision.[1]

### B.    Count I

In Count I of his complaint, plaintiff alleges fraudulent misrepresentation and concealment against all defendants.  (ECF No. 1, ¶¶ 93-113).  Specifically, he alleges that Brinkmann, Sebright, Flickinger, Wolf, JWR, Kersey, Danley, Resource, and NewWay each "made false material representations regarding the efficiency, capability, functionality, capacity, profitability and 'proven' characteristics of the PAD Systems (including the Demo PAD System) and the Waste Conversion System, as well as the value of the license agreements."  (*Id.* at ¶¶ 94-102).  He alleges each defendant had

---

[1] At oral argument on February 3, 2017, the parties agreed that if Missouri law did not apply, they would raise this in a motion to reconsider.  (ECF No. 106).

direct knowledge, at all times prior to, during, and after the execution of the license agreements, that the PAD Systems did not function as represented to plaintiff, were not "proven" in the sense represented to plaintiff, and had never in any form produced the levels promised to plaintiff.  (*Id.* at ¶¶ 103-05).  Plaintiff further alleges that Brinkmann, Sebright, Flickinger, Kersey, Danley, Resource, and NewWay knew and concealed that at least one prior PAD System sold by Resource "had been proven incapable of producing the outputs represented by defendants, had failed (by a large margin) to meet the specifications promised by defendants, and failed to meet those promised production levels even with the addition of an expensive thermal drying system . . . the very same thermal drying system defendants promised was not needed in order to make the PAD System successfully perform as promised."  (*Id.* at ¶ 106).

Under Federal Rule of Civil Procedure 9(b), a fraud allegation demands a higher degree of notice than that required for other claims, and a party must state "the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby."  *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007).  In other words, the complaint must state the "who, what, where, when, and how" of the alleged fraud.  *Id.*

Sebright and Brinkmann argue that plaintiff does not allege that statements within the license agreements were false and that puffery in the sales process – for example, that there were others willing to enter the agreements if plaintiff did not – is not actionable.  (ECF No. 123).   They also argue that plaintiff cannot rely on allegations of representations made by others in stating a claim against them, and that plaintiff is too vague and ambiguous as to the time, place, and content of any of their alleged representations, for example, when he states that Brinkmann and Sebright provided "input" in the brochure and spreadsheet.  Finally, they argue plaintiff relies on allegations of misrepresentations made after the license agreements were entered.

Danley and Kersey also move to dismiss Count I for failing to allege that either of them made any representations to plaintiff.  (ECF No. 125).  Wolf similarly argues that the amended complaint alleges no specific conduct attributable to him sufficient to state a

fraud allegation. (ECF No. 130). The only conduct specifically attributed to Wolf in the amended complaint is his attending a September 22, 2015 meeting and a November 30, 2015 meeting between plaintiff and other defendants. Plaintiff does not allege that Wolf met, spoke with, emailed, or otherwise contacted or interacted with plaintiff at all prior to plaintiff's execution of the license agreements and payment to Resource. Wolf argues that the actions of the other defendants cannot be imputed to him.

Finally, Resource argues that plaintiff's amended complaint fails to allege any specific action was taken by Resource, but rather that the statements of other defendants were made "on behalf of" Resource, and the allegations purporting to describe Resource's representations are practically identical to those attributed to the other corporate defendants NewWay, Sebright, and JWR. (ECF No. 134).

The court concludes that plaintiff has stated a claim for fraud against all defendants. Many of plaintiff's allegations individually do not support a claim for fraud, as they are too vague or involve statements nowhere alleged to be false. However, plaintiff has sufficiently alleged the following specific actions that meet the heightened pleading requirements of Rule 9(b). Plaintiff alleges that Brinkmann sent a brochure on behalf of Sebright[2] that falsely advertised the PAD Systems as proven and tested. (*Id.* at ¶¶ 7, 27-31, Ex. 1). The brochure refers to three individuals who are contacts for further information on the conversion technologies described: Flickinger for JWR, Brinkmann

---

[2] Plaintiff alleges this was also sent on behalf of NewWay and Resource, but only provides facts to support the allegation that Brinkmann was an agent of Sebright. Plaintiff alleges Brinkmann was a corporate officer of Sebright. He has not alleged any facts supporting the three elements of agency under Missouri law as to either NewWay or Resource. *See Affordable Communities of Missouri v. Fed. Nat. Mortg. Ass'n*, 714 F.3d 1069 (8th Cir. 2013) (holding that a complaint failing to allege facts supporting the legal conclusion that an agency relationship existed will not survive a motion to dismiss); *State ex rel. McDonald's Corp. v. Midkiff*, 226 S.W.3d 119, 123 (Mo. 2007) (Holding that in order to demonstrate an agency relationship under Missouri law a party must prove that (1) the agent has the power "to alter legal relationships between the principal and a third party," (2) the agent is "a fiduciary of the principal," and (3) the principal has "the right to control the conduct of the agent with respect to matters entrusted to the agent"); *Billings Mut. Ins. Co. v. Cameron Mut. Ins. Co.*, 229 S.W.3d 138, 147 (Mo. Ct. App. 2007) (holding officers of a corporation are its agents).

for Sebright, and Kersey for Resource. (*Id.* at Ex. 1). Plaintiff alleges that Brinkmann then sent a spreadsheet to plaintiff describing false production levels and profit potentials of the PAD System. (*Id.* at ¶¶ 35-36). Plaintiff alleges that Flickinger, on behalf of JWR and NewWay,[3] sent a budgetary quote to plaintiff falsely representing that the Waste Conversion System was the most efficient system available anywhere and combined "proven" technologies into one system. (*Id.* at ¶¶ 11, 13, 37-41, Ex. 2). This quote states it is from NewWay, and it is signed by NewWay. (*Id.* at Ex. 2). It was sent to Brinkmann from Danley on behalf of Resource and NewWay. (*Id.*). In late August, Brinkmann and Flickinger, on behalf of Sebright, JWR, and NewWay, met with plaintiff before he executed the license agreements, and they falsely represented that the PAD System would function at specific capacities. (*Id.* at ¶¶ 45-49). Brinkmann also sent an additional email falsely describing the profit percentages of the PAD Systems. (*Id.* at ¶ 53). Danley executed the License Agreements on behalf of Resource and accepted a $400,000 payment in exchange for two license agreements with plaintiff, with knowledge of the misrepresentations. (*Id.* at ¶¶ 54-55).

With the exception of two emails from Brinkmann – one where he sent a spreadsheet, and another where he described the profit percentages of the PAD Systems (*Id.* at ¶¶ 35-36, 53) – plaintiff alleges that each of these actions were taken by individuals in their capacities as corporate officers. Under Missouri law, officers of a corporation are its agents. *See Billings Mut. Ins. Co. v. Cameron Mut. Ins. Co.,* 229 S.W.3d 138, 147 (Mo. Ct. App. 2007). However, while it is generally true that holding a corporate office does not subject a party to personal liability for a corporation's misdeeds, a corporate officer may be held liable if that officer had actual or constructive knowledge of and participated in or approved of these wrongful acts. *Grothe v. Helterbrand,* 946 S.W.2d 301, 304 (Mo. Ct. App. 1997); *see also Constance v. B.B.C. Dev. Co.,* 25 S.W.3d

_____

[3] Plaintiff alleges that this was also sent on behalf of Resource, but only provides facts to support the allegation that Flickinger was an agent of JWR and NewWay. Plaintiff alleges Flickinger was a corporate officer of JWR and NewWay, but has not alleged facts otherwise supporting the elements of an agency relationship under Missouri law. *See Midkiff*, 226 S.W.3d at 123; *Billings*, 229 S.W.3d at 147.

571, 587 (Mo. Ct. App. 2000) (applying this rule in the context of a fraud claim). Plaintiff has alleged that Kersey and Danley were corporate officers of Resource and NewWay, and Wolf and Flickinger were corporate officers of NewWay and JWR. (ECF No. 113, ¶¶ 3-13,). Plaintiff has pled sufficient facts to support a claim that each of the plaintiffs had knowledge of and participated in or approved of the wrongful acts.

Accordingly, defendants' motions to dismiss this count are all denied.

## C.  <u>Count II</u>

In Count II, plaintiff alleges fraudulent inducement against Resource and seeks rescission of the license agreements between them. (*Id.* at ¶¶ 114-124). Similar to Count I, plaintiff alleges that Resource, by itself or through its agents, made false material representations regarding the functionality of the PAD System, had direct knowledge prior to and during the time plaintiff executed the license agreements that the PAD Systems did not function as promised; knew that the specifications promised were critical to the success of the Waste Conversion System and vital to the value of the license agreements; and intended their material representations to induce plaintiff to enter into and pay for the license agreements, perform hours of professional services, share industry contacts, and incur numerous expenses. Plaintiff alleges that he had no knowledge these representations were false and relied on them in entering into and paying for the License Agreements.

Resource moves to dismiss this count because the specific paragraphs cited within it contain only a single allegation of a fraudulent statement or representation made by Resource to plaintiff. However, plaintiff incorporated all of the preceding facts of the complaint by reference. (*Id.* at ¶ 114). On a motion to dismiss, a court will look to the entirety of the complaint. *Whitney v. Guys, Inc.,* 700 F.3d 1118, 1128 (8th Cir.2012).

For the reasons discussed with respect to Count I, the motion to dismiss this count is denied. Plaintiff has sufficiently alleged specific actions taken on Resource's behalf to state a claim for fraudulent inducement and rescission. (*Id.* at 29-31, 33, 45-49, Ex. 1).

## C.   <u>Count III</u>

In Count III, plaintiff claims negligent misrepresentation against all defendants. He alleges that defendants individually or through their agents made representations to plaintiff about the PAD System but failed to exercise reasonable care by determining whether the PAD Systems actually functioned at the capacities represented to plaintiff. (ECF No. 113, ¶¶ 125-131). The court dismissed this count in plaintiff's original complaint as barred by the economic loss doctrine, because it arose out of contract and essentially alleged that plaintiff failed to receive the benefit of his contractual bargain.

In his amended complaint, plaintiff has attempted to avoid dismissal by alleging that (1) he only entered into a contract with Resource, (2) the contracts are void or voidable, and (3) Resource and its agents owed fiduciary duties to plaintiff. (ECF No. 112, ¶¶ 127-130). None of these allegations save plaintiff's claim. The economic loss doctrine may apply to bar claims even when the parties to the suit are not parties to the contract, if the economic losses sought in recovery are contractual in nature and do not involve personal injury or property damage. *Captiva Lake Investments, LLC v. Ameristructure, Inc.*, 436 S.W.3d 619, 626 (Mo. Ct. App. 2014).

Plaintiff argues that damages proximately caused by an *intentional*, false representation are an exception to the economic loss doctrine. *Murphy v. Northwest Mut. Ins. Co.*, 2005 WL 1421789, at *2 (Mo. Ct. App. June 13, 2015). But this does not save plaintiff's claim of *negligent* misrepresentation. Such a claim, unlike plaintiff's Counts I and II for intentional fraud, does not fall within the fraud exception to the economic loss doctrine. *See id.* This court sees no reason to broaden the exception to the economic loss doctrine to allow this contract dispute to be remedied as a negligence claim.

As to plaintiff's argument that he suffered losses beyond the $400,000 contract price, in the form of expenses, time, and energy spent on marketing the Waste System, these are in the nature of consequential contractual damages. Had plaintiff enjoyed the benefit of his bargain he would not claim these losses. The case on which plaintiff relies, *Laidlaw Waste Systems, Inc. v. Mallinckrodt, Inc.*, 925 F.Supp. 624 (E.D. Mo. 1996),

does not support plaintiff's argument. It holds that in the context of a commercial contract:

> To recover in negligence there must be a showing of harm above and beyond disappointed expectations. A buyer's desire to enjoy the benefit of his bargain is not an interest that tort law traditionally protects. . . . The economic loss doctrine bars recovery on a tort theory in the commercial context wherein harm is to a consumer's commercial expectations.

925 F.Supp. at 635-36. In *Laidlaw*, parties had agreed to the deposit of non-hazardous waste on certain property in exchange for money. But the breaching party deposited hazardous waste, causing damage to the property. Damage to property falls squarely within the already-recognized exceptions to the economic loss doctrine under Missouri law. The separate losses plaintiff claims are not property damage or personal injury, but loss of expenses, time, and energy.

Finally, plaintiff's bare allegation that he was in a fiduciary relationship with defendants is insufficient to avoid the application of the economic loss doctrine, as he has alleged no facts from which the court can infer a fiduciary relationship existed. *See, e.g., Simply Thick, LLC v. Thermo Pac, LLC* 2014 WL 3543403 at *6 (E.D. Mo. July 17, 2014) ("Plaintiff's allegation that Heinz had superior knowledge related to the manufacture of food products is insufficient to establish the creation of a fiduciary obligation."); *Arnold v. Erkmann*, 934 S.W.2d 621, 629-30 (Mo. App. E.D. 1996) (plaintiff who alleged she was inexperienced in buying securities while defendant was experienced did not allege a fiduciary relationship where she did not allege that the defendant was acting for or undertook to act for the plaintiff's primary benefit).

Accordingly, plaintiff's claim of negligent misrepresentation still fails as a matter of law. Plaintiff is seeking to recover in tort economic losses that are contractual in nature. Damages for economic loss based on a contract may not be recovered in a negligence claim. *Dannix Painting, LLC v. Sherwin-Williams Co.*, 732 F.3d 902, 906 (8th Cir. 2013). This claim is dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

D.    <u>Count IV</u>

In Count IV, claiming unjust enrichment, plaintiff asserts that in addition to the $400,000 payment benefitting Resource and NewWay, he conferred benefits upon all defendants by giving them access to his professional industry contacts during the sales calls, as well as his professional time, efforts, and expenses to market and sell the PAD and Waste Conversion Systems.  (ECF No. 113, ¶¶ 133-35).  Plaintiff further alleges that he was instructed that he could remit the $600,000 payment to either Resource or NewWay and that all defendants stood to benefit from plaintiff entering the license agreements.  (*Id.* at ¶¶ 136-39).

Plaintiff's unjust enrichment claim is grounded in fraud.  Rule 9(b) applies to claims that require proof of fraud as a prerequisite to establishing liability.  *Streambend*, 781 F.3d at 1010 ("Claims 'grounded in fraud' must meet this heightened pleading requirement." (citations omitted)). A claim for unjust enrichment has three elements: (1) a benefit conferred by a plaintiff on a defendant; (2) the defendant's appreciation of the fact of the benefit; and (3) the acceptance and retention of the benefit by the defendant under circumstances in which it would be unjust to allow the defendant to retain the benefit.  *Executive Bd. of Mo. Baptist Convention v. Windermere Baptist Conference Ctr.*, 280 S.W.3d 678, 697 (Mo. App. 2009); *Hertz Corp. v. RAKS Hospitality, Inc.*, 196 S.W.3d 536, 543 (Mo. App. 2006).

Plaintiff has brought the unjust enrichment claim against all defendants, but he has failed to identify any specific benefit conferred on any defendant but Resource and NewWay.  While he does include additional allegations of benefits in the amended complaint – in the form of "access to [his] professional industry contacts" and "use of his professional time and efforts to market and sell the PAD System and Waste Conversion System" – under Missouri law, "recover for unjust enrichment is unavailable if the benefits to the defendants were created incidentally by the plaintiffs in pursuit of their own financial advantage."  *JB Contracting, Inc. v. Bierman*, 147 S.W.3d 814, 820 (Mo. Ct. App. 2004) (citations omitted).  Plaintiff alleges he was involved in the marketing efforts as part of a commercial, profit-seeking cooperation with defendants.  Plaintiff was

pursuing his own financial advantage in giving defendants access to his industry contacts and giving up his time and efforts to market the Waste System. While plaintiff states that Sebright and Brinkmann sold one Vertical Shaft Impactor at some point before November 2015, he does not allege that this was a benefit made at his expense or that he was involved in this sale in any way.

Accordingly, this claim is dismissed as to all defendants, except Resource and NewWay.

## D. <u>Count V</u>

In Count V, plaintiff claims civil conspiracy against all defendants. (ECF No. 113 at ¶¶ 144-57). Plaintiff alleges that all defendants conspired to fraudulently misrepresent the systems in order to obtain payment from plaintiff, pursuant to the license agreements, and to entice plaintiff to advertise the systems on their behalf, through sales calls. (*Id.* at ¶ 145). He alleges that all defendants had a meeting of the minds in the formation, design, establishment, and development of the Waste Conversion System, which depended on the PAD System functioning as represented to plaintiff. (*Id.* at ¶ 146). Plaintiff alleges that defendants worked in concert with one another through joint advertisements, like the brochure and budgetary estimate, and reaffirmation of the others' false representations, consistently misleading plaintiff into believing the PAD System would function as promised. (*Id.* at ¶¶150-51). Plaintiff alleges that the corporate defendants were not the principals or agents of each other but acted collectively as "partner companies." (*Id.* at ¶¶ 61, 149). He alleges that the defendants consistently reaffirmed each other's representations regarding the PAD System's efficiency, capability, functionality, capacity, profitability, and "proven" nature, as well as the value of the Waste Conversion System. (*Id.* at ¶ 152).

A claim for civil conspiracy must establish that: "(1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and, (5) the plaintiff was thereby damaged." *Creative Walking, Inc. v. Am. States Ins. Co.*, 25 S.W.3d 682, 688 (Mo. Ct. App. 2000) (citations

omitted). "Two entities that are not legally distinct cannot conspire with one another." *8000 Maryland, LLC v. Huntleigh Fin. Servs. Inc.*, 292 S.W.3d 439, 452 (Mo. Ct. App. 2009) (citations omitted). A corporation cannot conspire with its own employees. *Id.*

Plaintiff's amended complaint fails to allege the first element. Plaintiff continues to allege that the individual defendants are at once agents of the corporate defendants and also conspired with the corporate defendants.[4] An agent cannot conspire with his principal. *See Creative Walking*, 25 S.W.3d at 688. Plaintiff's conclusory allegation that "defendants Sebright, JWR, Resource, and NewWay, at all times, had agents and representatives, but were not the principals or agents of another" does not remedy this problem. (*Id.* at ¶ 149). It is conclusory and, even if it were to be regarded, it does not overcome the multiple allegations elsewhere throughout the complaint that the individuals and corporations named in this case are not legally distinct. Given plaintiff's allegations that the other defendants acted on behalf of and as representatives of the corporations, it would be legally impossible for them to have conspired with the corporations to further the corporations' interests.

Plaintiff also states that *Creative Walking*, 25 S.W.3d at 684-685, cannot be properly relied on because it is distinguishable from the facts of this case. However, plaintiff's attempts to distinguish this case are unavailing. In *Creative Walking*, the plaintiff alleged a civil conspiracy among an insurance company's claims manager, other agents and employees of the insurance companies, and a public accounting firm that participated in the claims adjustment process and allegedly acted as the insurance company's agent. The court held that because the claims manager and public accounting firm were both alleged to have acted as agents of the insurance company, "it would be legally impossible for them to conspire with [the insurance company] to further [its]

---

[4] Plaintiff has alleged that Danley and Kersey were corporate representatives of NewWay and Resource (ECF No. 113, ¶¶ 5-6), and Wolf and Flickinger were corporate representatives of JWR and NewWay. (*Id.* at ¶¶ 11-13). Plaintiff has alleged that Brinkmann was a corporate representative of Sebright and NewWay, and has also alleged that Flickinger was an agent of Sebright. (*Id.* at ¶¶ 1, 8, 21, 27, 43, 45, 46, 58, 59, 61-65, 68-70, 79, 89).

interests." *Creative Walking*, 25 S.W.3d at 688. The same impossibility is present here. Plaintiff's allegations that the individual defendants acted as agents of the corporate defendants make it impossible for them to have conspired with the other Defendants.

Plaintiff was given an opportunity to remedy this legal impossibility, but plaintiff again brought this claim against all defendants.

This claim is therefore dismissed.

**E.   Count VI**

In Count VI, plaintiff seeks to pierce the corporate veil as to Wolf, Flickinger, and JWR. He alleges that Flickinger was an employee and representative of JWR at all times relevant to plaintiff's complaint, while Wolf was the chief executive officer of JWR at all times relevant to the complaint. (ECF No. 113, ¶¶ 158-69). Plaintiff stated in response to defendants' motions to dismiss that he voluntarily dismisses this claim as to JWR and maintains it only against Flickinger and Wolf. (ECF No. 140).

Piercing the corporate veil "is the exception rather than the rule" in Missouri, *Love v. Ben Hicks Chevrolet, Inc.*, 655 S.W.2d 574, 576 (Mo. Ct. App. 1983), and Missouri law only permits piercing of the corporate veil under "narrow circumstances." *Hibbs v. Berger*, 430 S.W.3d 296, 306 (Mo. Ct. App. 2014). In Missouri, to pierce the corporate veil a plaintiff must allege facts demonstrating "complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own." *Doe 1631 v. Quest Diagnostics, Inc.*, 395 S.W.3d 8, 18 (Mo. banc 2013). The plaintiff must also allege facts demonstrating that such control was used by the defendant to commit the fraud or wrong and this control and breach of duty proximately caused the injury or unjust loss complained of. *Id.*

Corporations, LLCs, and other limited-liability entities exist to protect investors from personal liability upon compliance with specific statutory provisions." *Jackson v. O'Dell*, 851 S.W.2d 535, 537 (Mo. Ct. App. 1993); *see also Hibbs*, 430 S.W.3d at 306 ("Ordinarily, business entities . . . are regarded as wholly and separate legal entities . . .

[whose members] are not liable for the debts of their corporation or LLC."). Disregarding the protections of corporations and other limited-liability entities following a simplistic recitation of the elements of piercing the corporate veil would completely defeat the purpose of such entities, and contravenes the public policy of shielding investors, members, and shareholders from personal liability for their involvement in business ventures. Thus, under Missouri law, the legal separation of a corporation and its members is "ignored with caution and only when the circumstances clearly justify it." *Doe 1631*, 395 S.W.3d at 18 (citations omitted).

Plaintiff alleges only that Wolf and Flickinger "had complete control over the policy and business practices so that JWR, with respect to this particular transaction, had no separate mind." (ECF No. 113 at ¶¶ 161, 165). Plaintiff has not alleged that defendants Wolf and Flickinger had complete domination of JWR's finances, and his allegations as to their domination of JWR's policy and business practice are conclusory and indicate, at best, partial, not complete domination.

This Count is dismissed.

## F. <u>Count VII</u>

In Count VII, plaintiff seeks to pierce the corporate veil as to Kersey, Danley, Brinkmann, Flickinger, and Resource. (ECF No. 113, ¶¶ 170-97). However, plaintiff stated in response to defendants' motions to dismiss that he voluntarily dismisses this claim as to Flickinger and Resource. (ECF Nos. 140, 143).[5]

In applying the same standard discussed with respect to Count VI, this Count also fails to state a claim for piercing the corporate veil. Plaintiff alleges only that Danley was the Vice-President of Business Development at Resource, Kersey was the CEO of Resource, and Brinkmann made multiple representations and promises specific to Resource. (ECF No. 113, ¶¶ 171-73). Plaintiff alleges that Resource is made up of three corporate members: Medford Holdings, LLC; Prime Time Holdings, LLC; and Maverick

---

[5] Plaintiff also stated he voluntarily dismissed this claim as to Wolf, but this claim was never brought against Wolf. (ECF No. 113, ¶¶ 170-97; ECF No. 140).

Solutions, LLC. (*Id.* at ¶ 175). Plaintiff alleges that Danley is the sole owner of Medford Holdings, Kersey is the sole owner of Prime Time Holdings. (*Id.* at ¶¶ 176-79). Plaintiff alleges that based on these facts alone, Medford, Prime Time, and Resource are "strictly shell corporations whose actions are always specifically attributable to Kersey and Danley, individually." (*Id.* at ¶ 180). Finally, plaintiff alleges that Danley, Kersey, and Brinkmann "had complete control over the policy and business practices so that Resource, with respect to this particular transaction, had no separate mind." (ECF Nos. ¶¶ 181, 185, 189).

Again, plaintiff has not alleged the defendants Kersey, Danley, and Brinkmann had complete domination of Resource's finances, and his allegations as to their domination of Resource's policy and business practices are conclusory. The fact that Kersey and Danley are sole owners of two of the three member LLCs is also insufficient to demonstrate *complete* domination. Under Missouri law, "mere identity of shareholders, directors, or officers between two corporations is insufficient to find an identity of interests between the two entities to pierce the corporate veil." *Blanks v. Fluor Corp.*, 450 S.W.3d 308, 376 (Mo. Ct. App. 2014) (citations omitted). Even in terms of parent-subsidiary corporations, legal separation should be "ignored with caution and only when the circumstances clearly justify it." *Doe 1631*, 395 S.W.3d at 18 (citations omitted). Plaintiff has not alleged facts that, if true, demonstrate the complete domination justifying piercing the corporate veil.

Accordingly, this Count is dismissed.

## G.  <u>Count VIII</u>

In his last count, plaintiff seeks to pierce the corporate veil as to Danley, Kersey, Brinkmann, Wolf, Flickinger, and NewWay. (ECF No. 113, ¶¶ 198-231). However, plaintiff stated in response to defendants' motions to dismiss that he voluntarily dismisses this claim against NewWay. (ECF No. 142).

In applying the same standards discussed with respect to Counts VI and VII, this Count also fails to state a claim for piercing the corporate veil. Plaintiff alleges only that

NewWay was represented to him as a "holding company" formed to sell the Waste Conversion System, with corporate members of Medford, Prime Time, and Wolf Creek Holdings, LLC. (ECF No. 113, ¶¶ 199-200). Plaintiff alleges that Danley is the sole owner of Medford Holdings, Kersey is the sole owner of Prime Time Holdings, and Wolf is the sole owner of Wolf Creek. (*Id.* at ¶¶ 201-05). He alleges that Brinkmann and Flickinger made multiple representations and promises specific to NewWay and that Kersey, Danley, and Wolf are the "LLC Managers" of NewWay. (*Id.* at ¶ 207-09). Plaintiff alleges that based on these facts alone, Medford, Prime Time, Wolf Creek, and NewWay are "strictly shell corporations whose actions are always specifically attributable to Kersey and Danley, individually." (*Id.* at ¶ 180). Finally, plaintiff alleges that Danley, Kersey, Wolf, Brinkmann, and Flickinger "had complete control over the policy and business practices so that Resource, with respect to this particular transaction, had no separate mind." (*Id.* at ¶¶ 211, 215, 219, 223, 227).

Plaintiff has not alleged that defendants Kersey, Danley, Wolf, Brinkmann, or Flickinger had complete domination of NewWay's finances, and his allegations as to their domination of NewWay's policy and business practices are conclusory. The fact that Kersey, Danley, and Wolf are sole owners of NewWay's three member LLCs is insufficient to demonstrate *complete* domination. As discussed, "mere identity of shareholders, directors, or officers between two corporations is insufficient to find an identity of interests between the two entities to pierce the corporate veil," *Blanks*, 450 S.W.3d at 376, and even in terms of parent-subsidiary corporations, legal separation should be "ignored with caution and only when the circumstances clearly justify it." *Doe 1631*, 395 S.W.3d at 18 (citations omitted). Plaintiff has not alleged facts that, if true, demonstrate complete domination justifying piercing the corporate veil as to these defendants.

Accordingly, this Count is dismissed.

### III.    ORDER

For the above reasons,

**IT IS HEREBY ORDERED** that the motions of defendants to dismiss (ECF Nos. 122, 124, 127, 129, 135) are **granted in part as follows:**

a.      Count III is dismissed;

b.      Count IV is dismissed as to all defendants except Resource Converting, LLC, and NewWay Global Energy, LLC; and

c.      Counts V, VI, VII, and VIII are dismissed.

In all other respects the motions to dismiss are denied.

This case will proceed on the following claims:

1.      Count I against all defendants;

2.      Count II against Resource Converting, LLC; and

3.      Count IV against defendants Resource Converting, LLC, and NewWay Global Energy, LLC.

**IT IS FURTHER ORDERED** that the Case Management Order, issued December 6, 2016 (ECF No. 98) remains in effect.

_____/S/   David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**


Signed on May 24, 2017.