**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

TOM DUNNE, JR.,                          )
                                         )
            Plaintiff,                   )
                                         )
    v.                                   )            No. 4:16 CV 1351 DDN
                                         )
RESOURCE CONVERTING, LLC, et al.,        )
                                         )
            Defendants.                  )

## MEMORANDUM AND ORDER

This matter is before the Court on the parties' *Daubert* motions to exclude certain expert opinions (Docs. 498, 512, 514) and for other purposes addressed below (Docs. 534, 542, 547, and 549).   The Court grants the *Daubert* motions in part and denies them in part for the reasons set forth below.


## BACKGROUND

Plaintiff Tom Dunne, Jr. purchased licenses for defendant Resource Converting, LLC's (RCI) non-thermal, pulverizing, and drying system technology (PAD System), of which the stated purpose was to convert municipal waste into biomass and ultimately renewable fuels.   Dunne alleges defendants misrepresented the capabilities of the PAD System to him.   Defendants include RCI, its principals Tim Danley and Rick Kersey; JWR, Inc., its President, David Wolf, and its salesperson Jerry Flickinger; Sebright Products, Inc., and its salesperson Gary Brinkmann; and NewWay Global Energy, LLC, which Tim Danley, Rick Kersey, and David Wolf owned/operated.

Defendants now move to limit the testimony of plaintiff's expert, Nathiel G. Egosi, an expert in the design and construction of municipal solid waste (MSW) processing facilities in North America.   Plaintiff moves to limit the testimony of defense expert Michael Pratt, the testifying expert witness designated by defendants Sebright Products,

Inc., and Gary Brinkmann.   Plaintiff also moves to limit the testimony of Stephen Simmons, designated defense rebuttal expert.

## GENERAL LEGAL PRINCIPLES

Federal Rule of Evidence 702 allows a witness who qualifies as an expert by knowledge, skill, experience, training, or education to testify in the form of an opinion or otherwise about scientific, technical, or other specialized knowledge.  Fed. R. Evid. 702. Expert opinion testimony must pass threshold standards of reliability and relevance. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).  The inquiry of Rule 702 is a flexible one, *id.* at 594 n.12, although the *Daubert* court identified five important considerations relevant in determining whether these standards are met.

First, the evidence must be scientific, technical, or otherwise specialized.  Fed. R. Evid. 702.  Opinion evidence is "scientific" if it is grounded in the methods and procedures of science.  *Daubert*, 509 U.S. at 589-90.  Second, the evidence must be "knowledge" and not mere "subjective belief or unsupported speculation."  *Id*. at 590.  This means that the subject of scientific testimony must be derived by the scientific method.  *Id.*  Third, Rule 702 requires that the evidence be relevant in the sense that it is helpful to the trier of fact to decide a fact at issue.  *Id.* at 591-92.  Fourth, if the expert opinion is based on evidence that is inadmissible, the opinion may be admitted only if this evidence is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *Id.* at 595 (citing Fed. R. Evid. 703).  Fifth, the trial court must determine whether the expert's reasoning and methodology are reliable, *i.e.*, (a) whether they can be and have been tested; (b) whether they have been submitted to peer review and publication; (c) whether the asserted scientific technique has a known or potential rate of error; and (d) whether the asserted technique is generally accepted in the scientific community.  *Id.* at 593-94.

These standards can be summarized in Rule 702's post-*Daubert* amendment, which requires expert evidence be (a) such that it will help the trier of fact to understand the evidence or to determine a fact in issue; (b) based on sufficient facts or data; (c) the product

of reliable principles and methods; and (d) involve an application of the principles and methods to the facts of the case. Fed. R. Evid. 702 (2011). The Eighth Circuit has identified further factors that are relevant in determining reliability: the extent to which an opinion was developed for litigation, as opposed to naturally flowing from an expert's research, and the extent to which the proposed expert eliminated alternative explanations in reaching his or her conclusions. *See Sappington v. Skyjack, Inc.*, 512 F.3d 440, 449 (8th Cir. 2008) (citing *Lauzon v. Senco Prods., Inc.,* 270 F.3d 681, 686-87 (8th Cir. 2001)).

The proponent of expert evidence must show that it is reliable and would be helpful to the finder of fact, and that the expert is qualified to be a witness under Rule 702. Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory-committee's note. The expert must explain how he developed his opinions. Fed. R. Evid. 702 advisory-committee's note. An expert's opinion is subject to being rejected if it is substantially based upon the expert's subjective belief or unsupported speculation. *Est. of Groff v. Aquila, Inc.*, No. 4:05-CV- 0250 JAJ, 2007 WL 4644707, at *9 (S.D. Sept. 28, Iowa 2007) (*e.g.,* ruling expert opinion not admissible as unsupported and speculative regarding size of natural gas leak and that the hole through which the gas escaped could have or must have closed during shipment of the furnace). While the district court focuses on an expert's principles and methodology, expert conclusions may also factor into the admissibility calculus. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). A court may conclude that there is "simply too great an analytical gap" between a proffered opinion and the data in a case, and it is within the court's discretion to conclude that data relied upon is not sufficient to support an expert's conclusions. *Id.* A court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.*

## DISCUSSION

### *Plaintiff's Expert Nathiel G. Egosi, Professional Engineer*

Plaintiff's expert Nathiel G. Egosi is a professional engineer and President and Chief Executive Officer of RRT Design & Construction. He is recognized nationally as a leading authority in the solid waste engineering field, with frequent speaking engagements and

numerous publications presenting new technologies and facility designs. He is widely recognized as an industry expert in the engineering and construction of solid waste processing facilities and recycling equipment systems.  His background experience includes all aspects of project management, construction, and engineering of over 100 advanced solid waste processing and recycling facilities.  He is a licensed professional engineer in 23 states.  He received his B.S. in Civil Engineering from Polytechnic Institute of New York (now NYU School of Engineering) and holds an OSHA 10 Certification.  He has numerous professional affiliations.  He is a patent holder of an advanced processing system for the recycling industry.  Defendants do not question Egosi's qualifications.  The Court finds that Egosi is a qualified expert in the field of solid waste processing.

Egosi was deposed on March 4, 2019.  Ex. B, Egosi Dep.  Egosi's report sets forth five opinions:

1)  The PAD System marketed to Tom Dunne, Jr. was and is not commercially/ economically viable.

2)  There is no ready and available commercial market for the sale of "Power Bales" of dried MSW as an alternate fuel source whereby Dunne would expect to be paid for providing them.

3)  The "MSW" represented by RCI to have been processed by RCI through its PAD System in July 2015 was not representative of typical MSW and, therefore, misrepresented the PAD System's capabilities and market applications.

4)  RCI's use of the term "proven" as RCI represented to Dunne when describing its machinery and equipment as well as its systems for MSW applications does not meet the standard industry practice.

5)  Defendants withheld privileged information in violation of industry custom and practice that undermined their claims that the system was legitimate, viable, proven, commercial and "worked."

Ex. A, Egosi Report at 4-14.

Defendants challenge two of the five opinions in Egosi's report. They argue Egosi's fourth and fifth opinions on standard industry custom and practice should be excluded because: 1) his opinions are unreliable and not based on any industry standard, document,

4

or publication, and he provided no basis for his opinion on industry custom and practice; and 2) his opinions are lay opinions that do not require expert testimony and he merely proposes to tell the jury the verdict to reach on Plaintiff's fraudulent and negligent representation claims.

Defendants also challenge Egosi's opinion throughout his report on Defendants' intent or knowledge.  They complain that in proposing to testify about the Defendants knowledge and intent, Egosi refers to all defendants collectively throughout his report and that he should not be allowed to paint all the defendants with a broad brush and make general conclusions about their intent and knowledge.  Moreover, they argue these are lay opinions for the jury to decide.  In sum, Defendants argue Egosi's fourth and fifth opinions and certain portions of his testimony on defendants' knowledge and intent are unreliable, irrelevant, and will not assist the trier of fact, and thus fail to meet the standards set forth in Rule 702 and *Daubert* and its progeny.

**Egosi's Fourth Opinion**

Egosi's fourth opinion is that RCI's use of the term "proven" as RCI represented to Plaintiff when describing its machinery and equipment, as well as its systems for MSW applications, does not meet the standard industry practice.  Egosi states it is standard industry practice for a salesperson in the solid waste industry to use the term "proven" when a company has sold or installed at least one complete system for processing MSW. Egosi opines that Defendants' use of the term "proven" violated this standard industry practice and therefore misrepresented the PAD system was "proven" technology.  Ex. A, Egosi Report at 10-11. Defendants complain Egosi cannot identify a single industry document, technical paper, or publication that sets forth a standard definition of the term "proven," and instead relies exclusively on his experience within the industry to substantiate his opinion.  They argue Egosi fails to offer anything but *ipse dixit* to support his opinion and it should be excluded.  Defendants also assert it should be excluded because Egosi merely tells the jury that RCI made a false representation, an element of Plaintiff's fraudulent misrepresentation and negligent misrepresentation claims, supplanting the jury's role in evaluating the evidence.  Defendants argue this opinion will not be helpful to

5

the jury because an industry participant's knowledge based on standard industry practice is not relevant for proving Plaintiff's fraudulent misrepresentation claim. They argue that the issue for the jury is not what a person in *the industry* would think when Defendants used the term "proven" but what the parties in *this* case were thinking. (emphasis added.) They claim that there is no evidence that Plaintiff believed Defendants used the term "proven" based on some industry practice or that the Defendants knew about, or intended to use, an industry standard term. In short, they argue he cannot replace the jury's role in evaluating the evidence and his opinion is not relevant to the case.

Plaintiff responds that Egosi's Opinion No. 4 is reliable because it is based on his 35 years of experience as a leader in the waste management industry, including his knowledge of industry standards, publications, technical papers, and discussions with industry leaders. He argues it is relevant because it will assist the jury in deciding a factual issue. He argues that expert opinions on industry practice based solely on the expert's industry experience are reliable, citing Rule 702 and case authorities. He argues that given that defendants do not challenge Egosi's industry experience or qualifications, their argument that his opinion is unreliable fails.

Plaintiff also notes that no documents exist defining the term "proven" as used in this industry, therefore, there can be no analytical gap between Egosi's opinion and non-existent documents. At his deposition, Egosi explained that in the waste management industry, the term "proven" means that there is "at least one system out there that is" replicating what is marketed. Ex. B, Egosi Depo., at 214:10-17. Egosi testified that during the procurement process, the seller/manufacturer generally demonstrates that the system is "proven" by identifying "reference facilities" where the system is replicating what is marketed. *Id.*, at 215:18-216:2. Egosi explained that "you could pick up any other procurement document" and find the requirement for reference facility identification. *Id.*, at 216:6-9. Additionally, brochures from manufacturers promoting certain technologies always "provide a long list of reference facilities" indicating where the system is working. *Id.*, at 218:6-12. These documents do not include a definition of "proven" that Egosi failed

6

to consider, as Defendants suggest.  The documents/brochures show how sellers and manufacturers in this industry "prove" their systems.

The Court concludes Egosi's Opinion No. 4 regarding use of the term "proven" is admissible.  His opinion on the industry definition of "proven" does not tell the jury what result to reach or establish the elements of fraud, rather it assists the jury in its determination as to whether the "proven" representation was false by explaining that the PAD System was not "proven" as that term used in the industry.  Defendants' motion to exclude this opinion is denied.

### Egosi's Fifth Opinion

In his fifth opinion, Egosi states:

Industry custom and practice dictate that suppliers and technology licensors disclose technology limitations. Here, Defendants identified the PAD System at Paramount Farms as a "success," without disclosing information regarding the system's technology limitations.   Egosi Report, Doc. 499-1, pp. 11-12.

In this industry, the inclusion of trademarks and logos from established companies in the industry creates an "air of legitimacy" that indicates endorsement of the product.  Here, Defendant RCI, an unknown in the industry, added well-known company logos of Defendant JWR, Inc. and Defendant Sebright Products, Inc. to its marketing materials presented to Plaintiff, which in the industry, indicates those companies put their reputation and support behind the claims made in the marketing materials.  *Id.*, p. 12.3

Using the term "patented" is not the equivalent of "proven."  A company violates industry custom and practice if it relies on the term "patented" to show that the system is "proven."  *Id.*, pp. 12-13.

A company "violates industry custom and practice" if it represents that it has "several other installations when it does not." *Id.*, p. 13.5

A company "violates industry custom and practice" if it represents that the buyer risks losing a licensee opportunity because other individuals or entities are prepared to sign license agreements when that is not, in fact, the case.  *Id.*

A company "violates industry custom and practice" when representing that "RIN credits were readily available if, in fact, they were not." *Id.*

A company that does not provide sufficient testing data and capacity information to support the claimed capacities of its system violates "industry customs and practices." *Id.*, p. 14.

Defendants take issue with Egosi's identification of several instances where he believes Defendants violated standard industry practice and custom without providing any basis for his opinions except for his experience.  *See* Ex. A, Egosi Report at p. 11-14.  They argue these instances should be excluded because Egosi simply suggests Defendants withheld material information or made false representations that violate industry custom and practice in order to induce Plaintiff into purchasing the licensing agreement, *see* Ex. A, Egosi Report at 11-14, which are all elements of Plaintiff's fraudulent misrepresentation and negligent misrepresentation claims.  They argue his opinion does not bear on a factual inquiry but simply tells the jury how to find on these claims and replaces the jury's role in evaluating the evidence.  They further argue Egosi improperly speculates throughout his report on Defendants' intent or knowledge.  *See, e.g.*, Ex. A, Egosi Report at 7.  They argue an expert cannot testify about a party's purpose or motivation, state of mind, or what the party did or did not know.  They also contend that when discussing knowledge and intent, Egosi refers to the defendants collectively in his report and that he should not be allowed to paint all the defendants with a broad brush and make general conclusions about their intent and knowledge. They argue these are lay opinions for the jury to decide.  They note that Egosi admits that there is no industry practice written down on what capabilities or limitations should or should not be included in a company's sales pitch.  They argue that Egosi's opinion is not based on specialized knowledge but in the waste management industry, but general business knowledge regarding trademarks.  They assert that as such, certain portions of Egosi's opinions contain improper speculation about Defendants' intent and knowledge and are therefore inadmissible.

Plaintiff responds, reiterating that an expert may be qualified to offer opinions on industry customs and practices based solely on his experience.  He argues that Egosi's opinions are based not only on his 35 years of industry experience, but his evaluation of

case documents, interviews, review of testimony, and his personal experience with certain Defendants actually marketing the RCI PAD System to him. *See* Egosi Report, Doc. 499-1, pp. 14-15.  Plaintiff argues this is more than adequate to support Egosi's opinions concerning industry custom and practice.  Plaintiff states defendants' recourse is to challenge the reliability of Egosi's opinions on cross-examination.  He argues Egosi's opinions will help the jury understand what is and is not within industry custom and practice, which will assist the jury in making its own determination about whether other facts they learn throughout the case show Defendants violated that standard, particularly relevant to his negligent misrepresentation claim and the jury's determination of reasonableness.

With respect to state of mind, Plaintiff contends Egosi does not directly opine on Defendants' state of mind, rather he testifies about observable underlying facts that could be relevant to determining Defendants' state of mind, which is admissible expert testimony in this Circuit.  This Court agrees.

As an initial matter, in this District, an expert may be qualified to offer opinions on industry customs and practices based solely on his experience.  *Cf. McDonough v. JPMorgan Chase Bank, N.A.*, No. 4:15-CV-617-JCH, 2016 WL 4944099, at *1 (E.D. Mo. Sept. 16, 2016) (in lawsuit alleging violation of Fair Credit Reporting Act, plaintiff's expert, based on his 33 years of industry experience, opined about the relevant industry standards for reporting and investigating consumer credit data and how defendant's actions in connection with plaintiff's credit dispute comport with such standards.).  *Id.* at *2.

As to Opinion No. 2, Egosi opines that Defendants' failure to disclose certain information regarding the market for "Power Bales" violated industry custom and practice, because Defendants "knew or should have known" about the information. This is permissible because Egosi does not directly opine that Defendants did know, but rather points to documents to show that certain necessary equipment to remove wastes that cannot be burned was not included in the system marketed to Plaintiff.  Egosi's opinion that someone in the industry either knew or should have known that removal of such wastes was required in order to burn "Power Bales" of MSW as fuel is permissible because he is

not testifying to their actual knowledge, but what someone in the industry should know as a member of that industry. *See United States ex rel. Fesenmaier v. Cameron-Ehlen Grp.*, *Inc.,* No. 13-CV-3003 (WMW/DTS), 2021 WL 101193, at *15 (D. Minn. Jan. 12, 2021) (Expert testimony that directly opines about a party's state of mind is inadmissible, but an expert may testify about observable underlying facts that could be relevant to determining an individual or entity's intent.).

As to Opinion No. 3, Egosi reviewed the relevant pro formas and concluded that RCI "largely ignored or underestimated" costs to remove non-MSW material. This conclusion is a description of RCI's conduct, and it is admissible because Egosi does not opine that RCI intentionally or deliberately "ignored or underestimated" removal costs. *See, e.g., In re ResCap Liquidating Tr. Litig.*, 432 F. Supp. 3d 902, 930 (D. Minn. 2020) (acknowledging that "fact-based testimony as to what an entity actually did—as opposed to what it was motivated by, thought, or intended . . . does not cross the line into inadmissible testimony"); *Metro Sales, Inc. v. Core Consulting Grp., LLC*, 275 F. Supp. 3d 1023, 1058 n.13 (D. Minn. 2017) (observing that an expert may testify about underlying conduct that is indicative of the plaintiff's intent if such testimony will assist the factfinder in evaluating the plaintiff's actions). Here, Egosi's opinions do not conclude what defendants' state of mind, motivation, or intent is, but rather he opines on conduct.

As to Defendants taking issue with Egosi referring to "defendants" collectively in his report, plaintiff argues Egosi's opinions do not need to specify which defendants made which representation and notes defendants point to no legal authority that would require Egosi to do so.

The Court agrees. Egosi's opinions are intended to assist the trier of fact in understanding the industry customs and practices *after* the jury makes its own determinations about which defendants made what representations. *See Steven T. Huff LLC v. Monarch Cement Co.*, No. 15-3214-CV-S-BP, 2017 WL 9534753, at *3 (W.D. Mo. July 12, 2017) (holding that an expert may assume facts, "the validity of which are for the jury to determine"); *TCBY Sys., Inc. v. RSP Co., Inc.*, 33 F.3d 925, 929 (8th Cir. 1994) (noting that expert testimony that store did not meet minimum custom and practice observed by

franchisers in the industry was admissible as it helped jury to understand what was "reasonable" in that industry).

Defendants point to the statement in Egosi's Report that "RCI knew long before [Plaintiff] signed his license agreements ... that the PAD System at Paramount had failed to perform" Doc. 499, p. 13.   Egosi stated:

> Defendants represented to Tom Dunne, Jr. that its PAD System installation at Paramount Farms was a success, when clearly it had failed to perform non-thermally as the defendants represented to Tom Dunne, Jr. RCI withheld from Tom Dunne information that its PAD system did not work. That violates industry custom and practice where suppliers and technology licensors disclose and provide its technology limitations, as RCI knew long before Tom Dunne, Jr. signed his license agreements on August 21, 2015, that the PAD System at Paramount had failed to perform as represented and that thermal heaters would be added to the system in an attempt to make the system work. Yet this was not disclosed to Dunne.

Egosi Report, Doc. 499-1, p. 12.   When read in full, Egosi states what facts, if proven to be true, demonstrate a violation of industry custom and practice.  Egosi does not offer opinions concerning which specific defendants made representations that violate industry custom and practice because his opinions are meant to assist the jury in determining the significance of those representations, not who specifically made them. Defendants' motion to exclude this opinion is denied.


### Defendant's Expert Stephen Simmons

Plaintiff moves to exclude all testimony of designated expert rebuttal witness, Stephen Simmons, retained by defendants JWR, Inc.'s, Jerry Flickinger, and David Wolf. To counter Egosi's opinions, Simmons prepared a report dated June 24, 2021, which relied exclusively on an expert report prepared by Egosi dated March 1, 2018.   However, after Plaintiff compelled the production additional documents, Egosi updated his expert report on February 1, 2019.  Plaintiff notes the 2019 Egosi Expert Report contained significant revisions, additions, changes, and updates, increasing the length of the report by over 50 percent.  Plaintiff notes Simmons only saw the Egosi's 2019 Report for the first time at his

August 31, 2021 deposition, over a month after Simmons issued his June 24, 2021 expert report.  Plaintiff notes Simmons was not even aware of Egosi's second report until he was deposed. Plaintiff notes that Simmons testified at deposition that his entire report, and all his opinions contained therein, were based on the earlier and outdated 2018 version of Egosi's expert report, which Simmons had not read and, therefore, could not identify the differences between the two reports.  Ex.. 1 at 158:22-160:9.

Plaintiff asserts the Court should exclude Simmons as a testifying expert because he failed to read and consider Egosi's 2019 Expert Report, and thereby failed to employ a valid methodology that considered all the factual bases for Egosi's opinions that Simmons counters in his own expert report.  Plaintiff argues the fact that Simmons based all his opinions on the wrong expert report is fatal to the admission of his opinions.

Plaintiff then argues that even if Egosi had not produced a new expert report, Simmons's opinions do not meet the standard for admissibility of expert opinions and should be excluded.  He contends Simmons bases his opinions on insufficient facts or data, repeatedly relying on his own *ipse dixit* to state things he has not determined to be true and making claims he cannot factually support. Plaintiff further argues that Simmons employs leaps in logic that expose an unsound methodology and demonstrate the unreliability of his opinions, which are not based on reliable principles and methods.  Plaintiff concludes that as a result, Simmons's unsupported opinions, if admitted, would likely mislead the jury and cause confusion of the issues, and unfairly prejudice his case.

All defendants jointly oppose the motion, asserting plaintiff's argument is frivolous.  They argue that Simmons did in fact review both reports, and that even if Simmons had reviewed only one of Egosi's two reports, it would not make Simmons's testimony inadmissible because the two reports are so similar that a word-for-word reading is required to determine the differences.  They state that during Simmons's deposition, when Dunne's counsel showed Simmons Egosi's second report, Simmons stated he did not recall reviewing the second report or knowing the exact distinctions between the two reports. *See* Ex. B, Simmons Dep. at 158:22-160:9.   Defendants argue both reports are facially identical, reach almost all the same conclusions, and contain similar information.

Defendants argue Egosi simply provided additional explanation for some of his opinions in the second report.  Nevertheless, defendants explain that after his deposition, Simmons reviewed his file to refresh his memory. Ex. E, Simmons Aff. at ¶ 4.  Simmons received Egosi's second report on February 12, 2019 and read it before preparing his own report. *Id.* at ¶ 4-5. Because two years had passed since he was first provided Egosi's reports, and the two reports are very similar, Simmons failed to recall the distinctions between the two reports during his deposition.  *Id.* at ¶ 5.  Defendants state Simmons recently reviewed the second report again and confirmed that it did not change his opinions expressed in his report or at his deposition.  *Id.* at ¶ 6. Thus, they argue this argument should be rejected.

The Court has reviewed both reports.  The Court concludes both reports are facially similar, reach almost the same conclusions, and contain similar information.  However, Egosi provided additional explanation for some of his opinions in the second report.  In his affidavit, Simmons attested that because two years had passed since he was provided the reports, and the reports are very similar, he failed to recall the differences between the reports at his deposition.   Simmons recently reviewed the second report again and confirmed that it did not change his opinions in his report or at his deposition.  As to plaintiff's reliance on *Sappington v. Skyjack, Inc.*, 446 F. Supp.2d 1059, 1069 (W.D. Mo. 2006), there the expert affidavit submitted in response to a *Daubert* motion was stricken by the trial court and not considered by the trial court because it was a change in testimony from the expert's earlier deposition creating a sham issue. Here, however, any change in testimony concerning Simmons's recollection did not change the opinions expressed in his report or at his deposition.  Accordingly, plaintiff's first argument is rejected.

Plaintiff next argues Simmons's opinions do not meet the standard for admissibility for expert opinions.  He contends that throughout his report, Simmons bases his opinions on insufficient facts or data, repeatedly relying on his own *ipse dixit* to state things he has not determined to be true and making claims he cannot factually support.  Plaintiff asserts he employs leaps in logic that expose an unsound methodology and demonstrate the unreliability of his opinions, which are not based on reliable principles and methods.  As a result, his unsupported opinions, if admitted, would likely mislead the jury, confuse the

issues, and unfairly prejudice his case.  Finally, Plaintiff argues Simmons has not offered these opinions to any professional standard, including a reasonable degree of engineering certainty; instead, he testified he uses his own "best judgment."  See Ex.. 1 at 24:6-10.

The Court will address each of Simmons's nine opinions in turn.

Simmons Opinion No. 1 states:

> MSW has been successfully used for many years as a fuel source in Waste to Energy (WTE) facilities and when properly prepared or processed, in industrial applications.  There are multiple examples of facilities operating today who successfully convert MSW into an alternative fuel for use in industrial applications.

Plaintiff argues the above opinion is based on insufficient facts and data, utilizes a faulty subjective methodology, and is inherently unreliable and unhelpful.  He notes the issue in this case is whether representations made to him in 2015 were false at the time representations were made.  Plaintiff notes that when asked if Simmons considered whether there are any facilities in the United States that use MSW as a fuel where the feedstock was dried before sold as fuel, Simmons testified that he did not know one that was drying and operating in either 2016 or 2017.  *Id.* at 161:17-162:4. This demonstrates this opinion has no relevance in the case here, where the relevant time period is 2015 and 2016.  Whether a facility was built in 2019 or later has no relevance to whether a market existed at the time defendants' made representations to Dunne in 2015.  Plaintiff argues Simmons cannot identify any Waste to Energy (WTE) facilities or commercial consumers of MSW within the relevant radius of St. Louis.  He argues the fact that dissimilar WTE facilities exist elsewhere has no bearing on this case, and offering that opinion would only confuse the jury as to the relevant issues.

Defendants counter that plaintiff is wrong that the relevant time period for determining when a company may have purchased processed MSW from him was only 2015 and 2016.  They argue that there is no evidence that, had plaintiff purchased one or five PAD systems, he was going to build an MSW processing plant in 2015 or 2016, and that they will show that there was a potential market to sell MSW as an alternative fuel

source that could be used for industrial applications.  And simply because plaintiff was sold a license agreement for a PAD System in late 2015 does not mean that he was going to build a facility in 2015.

The Court excludes this opinion.  To be relevant, the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Faria v. McCarrick*, No. 4:16-CV-01175-JAR, 2019 WL 4695993, at \*15 (E.D. Mo. Sept. 26, 2019) (citing Fed. R. Evid. 702). The testimony must relate to "an issue in the case." *Id.*  Otherwise, it is irrelevant and inadmissible.   Fed. R. Evid. 402.   ("Irrelevant evidence is not admissible.").  The issue in this case is whether representations made to Dunne in 2015 were false at the time the representations were made. *Stevens v. Markirk Constr., Inc.,* 454 S.W.3d 875, 881 (Mo. 2015) (it is well-settled that the truth or falsity of a representation must be determined as of the time it was made and as of the time it was intended to be, and was, relied upon and acted upon).  The jury must decide whether the representations made in 2015 were false at the time that they were made in 2015.  Whether a facility was built somewhere in the United States years later has no relevance on whether a market existed in 2015.

Simmons's Opinion No. 2 states:

In 2015, there were industrial manufacturing companies within 100 miles of St. Louis, Missouri, most notably LafargeHolcim, who had the required regulatory permits to use alternative fuel and who had publicly announced plans to increase their use of alternative fuels as part of their worldwide corporate social responsibility and sustainability plans.

Plaintiff argues Simmons's Opinion No. 2 should be excluded based on insufficient facts or data, utilizing a faulty subjective methodology, and being demonstrably unreliable. He asserts Simmons could name only one such company, LafargeHolcim, at his deposition, and could not recall a second one, and therefore the opinion lacks factual support.  With respect to the one company, plaintiff notes Simmons did not even know if the plant actually burned tires and nonhazardous solid waste at the facility despite having a permit to do so.

Defendants, on the other hand, argue Rule 702 cannot be used to exclude expert testimony based on a disagreement between the parties on the relevant facts, citing Federal

Rule of Evidence 702, Advisory Committee Notes ("The emphasis in the [Rule 702] amendment on "sufficient facts or data" is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.").   "As a general rule, 'the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility.'" *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 614 (8th Cir. 2011); *see also Hartley v. Dillard's Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002) ("[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross examination.")

The Court agrees that this opinion goes to Simmons's credibility.  The appropriate mechanism to challenge it is "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."  *Daubert*, 509 U.S. at 596. Accordingly, the Court will allow this opinion.

Simmons' Opinion No. 3 states:

> In 2015, there were industrial manufacturing companies within 250 miles of St. Louis Missouri that might have had an interest in acquiring alternative fuel if it were economic as compared to traditional fuel sources.

Plaintiff contends this opinion should be excluded in its entirety as unhelpful and speculative.  Plaintiff points out that when asked whether he could point to an example that existed in 2015 within 250 miles of St. Louis where an entity was actively purchasing dried MSW, Simmons testified, "Not that I'm aware of."  Ex. 1 at 148:9-149:18.  When asked if he could identify any plants within 250 miles of St. Louis in 2015 or 2016 that were buying MSW for use as a fuel, Simmons responded, "I don't know" and that he did nothing to try to make that determination. *Id.* at 149:6-18.

The Court concludes this opinion is speculative, unsupported by a factual basis, and would be unhelpful to a jury in determining facts of consequence in this case.  Accordingly, the opinion is excluded.  *See Concord*, 207 F.3d at 1056–57 ("Expert testimony is inadmissible where ... it is excessively speculative or unsupported by sufficient facts.").

Simmons's Opinion No. 4 states:

An MSW alternative fuel production facility should have multiple sources of revenues, including disposal (or tipping fees) charged by the facility for accepting MSW from waste generators and collectors, the sale of material extracted (recycled) from the MSW such as paper, cardboard, plastic containers, along with ferrous and non-ferrous metals. The revenue earned through the sale of fuel is frequently the smallest source of revenue for these facilities.

Plaintiff asserts Simmons's Opinion No. 4 is not relevant or helpful to this case and will only serve to confuse the jury. He argues Simmons testified that he was offering the opinion for a system with or without a PAD System, and that he did not know much about PAD System costs. Ex. 1 at 178-79. He notes Simmons testified several times that he is not offering any opinions regarding whether the PAD system was commercial or economically viable. *See* Simmons Transcript at 128, 196, 231, nor does his expert report offer any opinions that the PAD system was or was not commercially or economically viable. When asked at his deposition how this opinion applies to this case, Simmons suggested the sale of fuel should be the smallest source of revenue at a WTE facility, but also agreed that the pro forma supplied by defendants lists it as the single largest source of revenue.

Defendants counter that the opinion is relevant because it shows that Dunne could have used the PAD System to make money from sources other than the sale of alternative fuel, which factors into whether the system was commercially and economically viable. They argue the jury should be able to consider other potential sources of revenue when assessing the economic viability of the PAD System. They argue Dunne cannot present expert testimony on this issue and then claim that the responsive expert's testimony is irrelevant.

The Court concludes this is opinion is arguably relevant and will allow this testimony.

Simmons's Opinion No. 5 states:

Mr. Egosi is incorrect where in his Expert Report he states in Opinion number 2: "There is not a **ready and available** commercial market for the sale of 'Power Bales' of dried MSW as an alternative fuel source whereby Tom Dunne, Jr. would expect to be paid for providing them."   My research and analysis indicate there was a **potential market** for MSW derived Alternative Fuel and [sic] the St. Louis area.

Ex. 2, p. 6. (emphasis added).

Plaintiff argues Simmons's Opinion No. 5 should be excluded because it is based on insufficient facts and data, utilizes a faulty subjective methodology, and is inherently unreliable and unhelpful.  Simmons testified that if LafargeHolcim in 2015 was purchasing dried MSW and using it as a fuel in its Ste. Genevieve, Missouri, plant, that it would be evidence there was a "ready and available" market.  *Ex..* 1 at 181:10-16.  Simmons then testified that "if nobody is buying it, it's no longer a ready and available market, but just a potential market."  *Id.* at 181:17-21.  When asked, "So what's incorrect about what Mr. Egosi's opinion states when he says there is no ready and available commercial market?" *Id.* at 181:22-24.  Simmons testified, "I stated it as I stated it. I think there was a potential market for the MSW."  *Id.* at 181:25-182:1.

Plaintiff argues, citing deposition testimony, Simmons repeatedly refused to clarify whether he was opining there was not a ready and available commercial market for sale of power bales of dried MSW in 2015, and instead kept repeating, "there was a potential market."  *Id.* at 182:2-183:2.   Simmons then testified he believed there was a potential market in 2015 and still a potential market today, but then testified that he is not aware of any entity within 250 miles of St. Louis that is processing MSW as a fuel source, even today.  *Id.* at 186.

Defendants assert plaintiff's criticism that in forming his opinion, Simmons should have considered whether these entities actively purchased alternative fuels derived from MSW in 2015 to 2016, goes to the weight, not the admissibility of the testimony. Likewise, they argue any criticism of Simmons's methodology for analyzing the potential markets in St. Louis can be addressed during cross-examination.  They argue Egosi made

the bold claim that there are no cement kilns within 500 miles of St. Louis that would be interested in buying processed MSW to burn as fuel and Simmons's opinion directly contradicts that. As to plaintiff's argument that Simmons could only consider "ready and available markets" in forming his opinion about the market in the St. Louis area and the suggestion that his methodology is faulty because he defined markets for PAD System differently than Egosi, defendants assert Simmons defined a potential market as a business opportunity Dunne could have explored or as a possible customer of alternative fuel. They argue Simmons was not required to employ the same methodology as Egosi in reaching his opinion.

The Court has reviewed the relevant deposition excerpts of which plaintiff complains. The exchanges demonstrate Simmons's Opinion No. 5, if not barred, would only serve to confuse the jury and muddle the issues at trial. The Court concludes Simmons did not base his opinion on sufficient facts and data, nor did he use a reliable methodology to form his opinion. Instead he attempts to redefine words to manufacture a disagreement with plaintiff's expert Egosi. "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 147; *Marmo*, 457 F.3d at 758. Words such as "might" or "potential" or "possible" simply note speculation and do not rise to the standard of offering expert opinions. Here, Simmons is speculating, and there is too great an analytical gap between the data and the opinion proffered. *Concord Boat Corp.,* 207 F.3d at 1056–57 ("Expert testimony is inadmissible where ... it is excessively speculative or unsupported by sufficient facts.").

Accordingly, the Court bars Simmons from offering this opinion.

Simmons's Opinion No. 6 states:

Based on my personal inspection of operating facilities actively converting mixed municipal solid waste into Alternative Fuel, I conclude there is an **active market** for such facilities in the United States.

*Ex.* 2, p. 10. (emphasis added). In his report, Simmons lists many facilities across the United States that were formerly or are now involved in the waste to fuel industry. *See,*

*e.g.*, Ex. 2, pp. 13-16.  Plaintiff argues that to have relevance here, however, those facilities would have to be located within 250 miles of St. Louis and require drying of the MSW feedstock.  Simmons testified that the relevant area for an "active market" is 250 miles, outside of which transportation costs negatively affect the ability to market a product.  Exh. 1 at 131:7-24 (emphasis added).  Therefore, plaintiff asserts the opinion that there are active markets for alternative fuels in the United States is only relevant in this case if there is an active market within 250 miles of St. Louis, the geographic area associated with his licenses.

Simmons testified he was not aware of any entity within 250 miles of St. Louis that is processing MSW as a fuel source, even today.  *Id.* 186:18-21.  When asked whether he could point to one example that existed in 2015 within 250 miles of St. Louis where an entity was actively purchasing dried MSW, he testified not that he was aware of.  *Id.* at 148:9-149:18. When asked if he could identify any plants within 250 miles of St. Louis in 2015 or 2016 that were buying MSW for use as a fuel, Simmons testified that he did not know and did nothing to try to make that determination.  *Id.* at 149:6-18.

Defendants make the same argument in support of admission as for the previous opinion, that any criticism goes to the weight, not admissibility of the expert opinion.  For the same reasons set forth above, the Court excludes this opinion.  Simmons' opinion that there is an "active market" is irrelevant given that he has no support to conclude there is an active market within 250 miles of St. Louis, the only relevant market in this case. Allowing Simmons to offer this opinion would only lead to possible confusion with a jury because it suggests Plaintiff had access to an active market when Simmons has provided no evidence to support that.

Simmons's Opinion No. 7 states:

Mr. Egosi implies that only systems using thermal dryers can dry MSW to a usable condition.

He then goes on to opine that Egosi is wrong.  Ex. 2, p. 10. (emphasis added).

Plaintiff argues the opinion is inadmissible because Simmons bases his opinion on a false statement, namely, that Egosi implied something in his report that he did not.

Plaintiff notes Simmons was unable to point to any statement in Egosi's 2019 Expert Report that supported his claim that Egosi "implies" that only systems using thermal dryers can dry MSW to a usable condition.  *See* Ex. 1 at 188:10-189:1, 191:6-192:10, 194:5-11. Plaintiff notes that in fact, no such statement appears in Egosi's 2019 Expert Report.  While Simmons did point to this sentence in Egosi's Report: "The associated energy cost associated with using such heaters, however, makes drying of MSW uneconomical given the high moisture of MSW and its lack of intrinsic value," he failed to identify anywhere in the report where Egosi implies only thermal drying systems can dry MSW to a usable condition.  *See* Ex. 1 at 188:10-189:1, 191:6-192:10, 194:5-11.

Defendants argue plaintiff is merely parsing words.

The Court disagrees.  Simmons's Opinion No. 7 will not be permitted because it mischaracterizes what Egosi states in his report.  It would confuse the jury to permit an opinion that Egosi stated something that he did not, and then to criticize him for it.

Simmons's Opinion No. 8:

Simmons disagrees with Egosi's Opinion No. 4 that "RCI's use of the term 'proven' as RCI represented to Mr. Dunne when describing its machinery and equipment as well as its systems for MSW applications does not meet the standard industry practice."

Simmons disagrees and offers his counter-opinion: "In my experience, it is standard industry practice for **buyers** to define the definition of terms and the standards for equipment and systems they are purchasing."

Ex. 2, p. 13.  (emphasis added).

Plaintiff argues Simmons's Opinion No. 8 is irrelevant for two reasons. First, Simmons testified that he is not offering the opinion that it is standard industry practice for buyers to define the term "proven" when the seller is representing that something is tried and proven.  Doc. 515-1, 216:21-25.  Plaintiff argues Simmons's exception to his opinion applies here because defendants, i.e., the sellers, labeled the PAD System as "proven."  Second, plaintiff argues it is irrelevant whether he, as the buyer, did or did not define the term "proven" before purchasing the PAD System.  Plaintiff argues defendants represented

to him that the PAD System was a "proven," system, and to prevail on his fraudulent and negligent misrepresentation claims, he must show that defendants knew or should have known that the system was not "proven."  *See, e.g., Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 131-32, 134 (Mo. 2010) (one element of fraudulent misrepresentation is the speaker's knowledge of the representation's falsity or ignorance of its truth; one element of negligent misrepresentation is because of the speaker's failure to exercise reasonable care, the information was false).  Plaintiff argues it is irrelevant how buyers define the term because this will not help the jury determine whether Defendants, i.e., the sellers, knew that their representation that the PAD System was "proven" was false, which is the issue in this case.  *Faria*, 2019 WL 4695993, at *15 (To be relevant, the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue.").  Plaintiff contends that telling the jury the buyer should have defined the term "proven" upfront merely distracts the jury from the issue here, i.e., whether defendants fraudulently or negligently misrepresented that the PAD System was "proven."  Plaintiff also contends the opinion is unreliable because Simmons did nothing to validate his opinion that there is no recognized definition of the term "proven" in this industry other than noting that the definition does not appear in industry publications.

Defendant counters that plaintiff has mischaracterized Simmons's opinion because Simmons was merely opining in response to Egosi's fourth opinion, i.e., that there is no industry standard or practice when using the term "proven" in the solid waste industry. They argue that if Egosi is allowed to testify on this issue, then they, too, must be allowed to offer their own expert to testify on the same subject.

The Court will not allow Simmons's opinion that it is standard industry practice for buyers to define the term "proven" when the seller is representing that something is tried and proven because it is irrelevant to plaintiff's claims and would likely confuse the jury. However, Simmons may offer his opinion, subject to cross-examination, that based on his review of industry publications, there is no "recognized definition" of the term "proven" in the industry, and that to him "proven" means "demonstrated," because it is relevant.

### *Simmons's Opinion about Patents*

Plaintiff opposes Simmons's opinion concerning patents.   To restate, Egosi's

Opinion No. 5 states, among other things:

> Defendants withheld privileged information in violation of industry custom and practice that undermined their claims that the system was legitimate, viable, proven, commercial and "worked."

(Ex. 1 at 235:11-18.)

Egosi further opined about patents:

> Using the fact that something is patented as an attempt to prove that it functions as represented violates industry custom and practice.

Doc. 515-3, pp. 12-13.

In response, Simmons opines:

> In my experience, it is standard industry practice for buyers to require patent protection representations along with indemnification relating to patent infringement liability.

Doc. 515-2, p. 14.

Plaintiff argues the opinion is inadmissible because nowhere does Simmons state any disagreement with anything stated by Egosi; rather, Simmons attempts to offer an opinion that has nothing to do with Egosi's opinion.  Plaintiff contends Simmons does not explain, repel, counteract, or disprove Egosi's opinion, but merely states that it is standard industry practice for buyers to require "patented" systems.  Plaintiff argues this is irrelevant to Egosi's opinion, and therefore will not help the jury in determining whether Egosi's opinions are correct.  Plaintiff argues that no one disputes that buyers require "patented" systems; however, the dispute is whether defendants can rely on the term "patented" to prove that a system is "proven." Plaintiff asserts defendants fail to meet their burden to show how Simmons's opinion is relevant.

Defendants simply assert that the opinion is a "direct disagreement" with Egosi's opinion.  Doc. 525, p. 17.  They argue any criticism is simply a parsing of words because

Egosi implies without explicitly stating that defendants' use of the term "patented" was misleading.  *Id.* at 19.

The Court concludes Simmons's opinion does not fulfill the function of rebuttal expert testimony, i.e., to explain, repel, counteract, or disprove, and would not be helpful to a jury.  *See Roberts v. Lombardi,* No. 1:12-CV-134-SNLJ, 2015 WL 3454509, at *1 (E.D. Mo. May 29, 2015) (function of rebuttal expert testimony is to explain, repel, counteract, or disprove "the opinions offered" by the other party's expert).  Nor have defendants demonstrated how this opinion is relevant.  Accordingly, the Court excludes it.

### *Defendants' Expert Michael D. Pratt, Mechanical Engineer*

Plaintiff has offered Dr. Shahabadine Sokhansanj as his testifying expert concerning the capabilities and limitations of the PAD System.  To rebut Dr. Sokhansanj's expert opinions, Defendants Sebright Products, Inc., and Gary Brinkmann disclosed Michael Pratt, a mechanical engineer, as their testifying expert.

Pratt received a B.S. in Mechanical Engineering from the University of North Carolina in 1993. (Doc. 513-05.)  He has over 30 years of experience in mechanical and forensic engineering. (*Id.*)  He is a licensed professional engineer in 16 states. (*Id.*)  He has been a consulting engineer for over 27 years.  (*Id.*)  He considers himself an expert in mechanical engineering and in the operation, maintenance, and repair of air drying systems. (Pratt Depo. Tr. 52:21–53:9; Doc. 513-03.) He has testified hundreds of times as a consulting engineer.  Much of his expert witness work has been in the nature of the cause of fires in industrial equipment.  He has conducted three or four evaluations of cyclonic drying systems throughout his career.  (Pratt Depo. Tr. 46:5–47:19; Doc. 513-03.)

Pratt reviewed Dr. Sokhansanj's expert witness report, offered a number of criticisms of Dr. Sokhansanj's methodology, and outlined what he believes are five flaws in Dr. Sokhansanj's model.  The five flaws are summarized as follows:

> (1) "Dr. Sokhansanj's model does not account for moisture removal during the pre-processing stage of the system."

(2) Dr. Sokhansanj "failed to account for the increased drying rate that would occur if the samples were mechanically agitated" in determining his drying rate.

(3) "The model ignores the 'high intensity drying' that will occur when the feedstock particles collide in the cyclones."

(4) "The model allows the user to set a particle size for the incoming feedstock."

(5) "Dr. Sokhansanj's conclusions do not support the output of the analytical model" and the model does not take into account "continuous particle size reduction in the drying system will release moisture from the feedstock."

Pratt concluded: "Dr. Sokhansanj's report and analytical model detail his evaluation of the drying kinetics that occur in a Dryclone Air Drying System.  However, his model does not account for impinging drying nor the release of moisture from particle reduction as the feedstock moves through the system.  His model also doesn't account for the reduction in feedstock moisture content through the pre-processing stage.  Therefore, he has underestimated the drying capacity of the system."   (Doc. 513. Ex. 5 at 4 (the 2021 Pratt Report).)

Plaintiff moves to exclude Pratt's proffered opinions on the basis that they do not meet the standard for admissibility of expert opinions.  Plaintiff argues Pratt is not qualified to offer the opinions in his 2021 Report and that his opinions are not  helpful to a jury.  He argues Pratt's opinions are not based on sufficient facts or data and are not the product of reliable principles and methods, which are unreliable when applied to the facts of this case. Plaintiff also notes Pratt fails to offer his opinions to a reasonable degree of "engineering certainty" and offers little more than his own *ipse dixit* in support of his opinions.  Plaintiff notes Pratt's sole assignment was to "comment" on the report of Dr. Sokhansanj.  Ex. 3 at 188:9-11.  Pratt testified the scope of his engagement was to "[s]imply to review Dr. Sokhansanj's report and provide comment.".  He stated, "I've provided opinions after ... reviewing Dr. Sokhansanj's report.  I wouldn't call it a rebuttal or challenge." *Id.* at 222:1-3.  He does not consider himself an expert in air drying systems. *Id.* at 52:24-53:3; *see also* Ex. 1 at 162:3-4 ("I would not classify myself as an expert in air drying systems.")

Plaintiff complains that Pratt does not actually opine that any of Dr. Sokhansanj's expert opinions are incorrect, rather Pratt simply points out how Dr. Sokhansanj might have done more to increase the accuracy of his model but that this, however, does not affect the accuracy of Dr. Sokhansanj's expert opinions.  Plaintiff asserts Pratt's "comments" will not assist a jury to determine any fact of consequence, and therefore do not qualify as admissible expert opinions.  Plaintiff further notes Pratt did not do any failure analysis of the RCI PAD System and testified at his deposition that he has not evaluated the PAD System or ever seen it in person.  *Id.* at 49:23-24, 52:8-10.  Pratt has not attempted to model the RCI PAD System nor has he ever modeled any other air-drying system that dried MSW. *Id*. at 51:20-25.

Defendants oppose the motion.  Defendants argue that to the extent plaintiff is critical of the amount of experience that Pratt has in that area, that is a proper subject for cross-examination, but not a basis for excluding his testimony entirely.  They note Pratt was also able to understand the technology by reviewing patents and the *Handbook of Industrial Drying*.  They assert Pratt's testimony will help the jury to understand Dr. Sokhansanj's model and the limitations on the accuracy of that model by explaining how the addition of relevant variables would have altered the results, thereby changing the accuracy of the model.  Defendants argue that as a mechanical engineer with experience with cyclonic and air drying systems, Pratt can explain how agitation, reduction in particle size, and impingement can all increase drying rates. They argue Pratt can also explain that these variables were omitted from Dr. Sokhansanj's model.  They argue Pratt supports his opinion with sufficient facts and data.

As to the five purported flaws, defendants note that Pratt's criticism that Dr. Sokhansanj's model does not account for moisture removal during the pre-processing stage of the system is supported by Pratt's own understanding of the pre-processing system and Dr. Sokhansanj's own testimony admitting as much.  They note Pratt knew how the pre-processing system was designed to work, had discussed it with Gary Brinkmann of Sebright Products, and was familiar with the technology used in vertical shaft impactors,

part of the pre-processing equipment. (Pratt Depo. Tr. 127:14 – 131:13; Ex. 1.)  They argue that as a result, his criticisms of Dr. Sokhansanj on that point are fully supported.

Defendants contend that Pratt's criticism of Dr. Sokhansanj's failure to account for mechanical agitation is both supported and helpful, and that plaintiff's contention that Pratt's opinion is unsupported is false.  Defendants argue Pratt's opinion was based on his mechanical knowledge, experience, and expertise in understanding how numerous drying systems work.  (Pratt Depo. Tr. 130:25 – 131:13; Ex. 1.)  Defendants assert Pratt's criticism that Dr. Sokhansanj's model ignores drying that will occur when feedstock particles collide is supported by both materials appearing in the *Handbook for Industrial Drying* and his understanding of the technology and theory behind removal of loosely bound water from impacting particles.  (Pratt Depo. Tr. 158:10 – 18; Doc. 513-03.)   They also argue Pratt's criticisms regarding particle size and pulverization, as well as inconsistency with Dr. Sokhansanj's analytical model, are well-founded.   They contend Pratt used reliable methodology to inform his opinion, specifically, an authoritative text on the subject of industrial drying, his own expertise and experience as a mechanical engineer, and the facts of the case.

As to Plaintiff's argument that Pratt does not have sufficient experience with the cyclonic drying systems or drying of MSW to serve as an expert in this case, defendants note that Pratt testified that he does have experience with cyclonic drying systems. (Pratt Depo. Tr. 46:5–9; Ex. 1.)  They contend it is not necessary that Pratt have the "absurdly specific experience" plaintiff seems to demand with cyclonic drying systems used to dry MSW.  Defendants argue his experience as a mechanical engineer and some experience in cyclonic drying systems is more than sufficient for him to form an opinion on the basic mechanics of drying.

The Court concludes that Pratt's opinions, even if otherwise admissible, would not be helpful to a jury.  Pratt testified that the scope of his assignment was "[s]imply to review Dr. Sokhansanj's report and provide comment," which prevented Pratt from offering more than mere speculation or "comments" on Dr. Sokhansanj's report.  Ex. 3 at 188:9-11.  More is required to offer admissible expert opinion testimony: "an expert may extrapolate from

data supplied by other experts . . . but a person does not become an expert simply be reviewing an expert's reports or research," which is cause to exclude such testimony. *Larson v. Kempker*, 414 F.3d 936, 941 (8th Cir. 1995).   If "an expert's opinion is so fundamentally unsupported that it can offer no assistance to a jury, it must be excluded." *Id.*   In this case, Pratt merely reviewed Dr. Sokhansanj's expert report, which does not qualify him to testify and offer his comments to a jury.

Pratt also does not offer any opinion that any of Dr. Sokhansanj's opinions offered in his expert report are incorrect, and he testified at his deposition that he would not describe his comments as a rebuttal or a challenge.   Defendants simply asked Pratt to read Dr. Sokhansanj's report and look at his model and comment on it. *Id.* at 194:19-23.   Pratt comments that Dr. Sokhansanj's model does not perfectly model the PAD System.   He opines that there are things Dr. Sokhansanj possibly could have done to make his model more accurate, even though Pratt himself does not know whether it was even possible to do so.

This manner of testimony could only serve to confuse a jury, not assist it.   Pratt himself stated that he cannot call himself an expert on the subject matter.   Pratt did not testify to a reasonable degree of engineering certainty.   He admitted that he cannot disagree with the opposing expert's proffered opinions and that he does not know whether his opinions would be helpful to a jury.   For these reasons, Rule 702 has not been satisfied.

The Court also concludes several of Pratt's criticisms are unsupported.   With respect to Pratt's criticism that Dr. Sokhansanj's model does not account for moisture removal during the pre-processing stage of the system, Pratt's support for his claim was merely past experience and information learned from his client, Gary Brinkman.

As to Pratt's criticism that Dr. Sokhansanj failed to account for the increased drying rate that would occur if the samples were mechanically agitated, the criticism is unsupported and unhelpful to a jury because Pratt has never done any testing to show that agitation of MSW would increase the drying rate, he has not reviewed any studies that show that, nor has he conducted any experiments on MSW to show that would be the case. Ex. 3 at 131:19-132:1; 208:5-17.

As to Pratt's criticism that the model ignores the "high intensity drying" that will occur when the feedstock particles collide in the cyclones, the criticism is unsupported because Pratt relies on Impinging Stream Dryers (ISDs) which have no reliable application to the PAD System beyond his theoretical analogy.

With respect to Pratt's criticism regarding particle size, the criticism is unfounded because Pratt testified at his deposition that if the particle size reduction in Dr. Sokhansanj's model overstated the drying capacity of the PAD System, then Dr. Sokhansanj could in fact be overstating the drying capacity of the PAD System. *Id.* at 169.

Pratt finally claims that Dr. Sokhansanj offered inconsistent testimony that no pulverizing occurs in a cyclone and that there should be no particle size reduction, even though his model does show particle size reduction. However, Pratt testified that some dictionaries define "pulverize" as complete destruction of material to turn it into powder or dust. He further testified that MSW coming out of a PAD System would not all be powder or dust as the term pulverization would suggest. *Id.* at 174:1-176:2. Therefore, Dr. Sokhansanj's testimony was not inconsistent. Additionally, Pratt provided no citation for his assertion that Dr. Sokhansanj had claimed that there was no particle size reduction as the feedstock moves through the cyclone. *Id.* at 176:7-22. Yet, when shown contradictory testimony from Dr. Sokhansanj's deposition, Pratt testified he was not opining that there was no particle size reduction as the feedstock moves through the cyclone. *Id.* at 177:3-178:4.

Defendants do not meet their burden to show that Pratt's opinions satisfy the reliability requirement. The reliability requirement requires the proponent to prove that: (1) the expert is qualified to render the opinion; and (2) the underlying methodology to the opinion is scientifically valid. *Presley*, 553 F.3d at 643. When acting as a gatekeeper, the district court examines the following four non-exclusive factors in determining the reliability of an expert's opinion: (1) "whether it can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) whether the concept has a "known or potential rate of error," and (4) whether the concept is generally

accepted by the relevant community.  *Daubert*, 509 U.S. 579 (1993); *see also Polski v. Quigley, Corp.,* 538 F.3d 836, 840 (8th Cir. 2008)(affirming the district court's decision to exclude expert testimony "because [the 'experts'] theory has not been tested at all, it has never been subjected to peer review and publication, nor has it been generally accepted in the scientific community, nor does it have a known or potential rate of error.").   Here Pratt testified that several of his opinions could be tested but he did not do so.  (Ex. 3 at 203-16.) Nor was he aware of any peer review or publication that performed such testing.

Pratt also did not employ a reliable methodology.  An expert's methodology is unreliable if the expert fails to complete required procedures or fails to account for relevant variables.  *See U.S. Salt, Inc., v. Broken Arrow*, 563 F.3d 687, 691 (8th Cir. 2009). Additionally "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric Co*., 522 U.S. at 147.  Here, when asked about the methodology he used to determine that high intensity drying will occur in the PAD System, Pratt testified that he read a chapter on ISD from the *Handbook of Industrial Drying*, reviewed his client's deposition, and another individual's deposition. Ex. 3 at 200:18-201:1. When asked about his methodology of reviewing the *Handbook of Industrial Drying's* chapter on a different type of drying, Pratt explained: "The handbook talks about different types of dryers, but it still references the same theory that I'm using in my conclusion that there's high intensity drying that's occurring.   That's the methodology."  *Id*. at 201:12-19.  When asked how he knew it was 100% accurate when he did no testing of his theory, and when the PAD System has neither introduction of high-heat nor opposing airstreams like an ISD does, Pratt testified, "I'm basing it on my extensive experience in mechanical engineering...," despite having never seen an ISD system.  *Id.* at 202:3-13; 203:12-16.  The Court concludes this amounts to little more than speculation, rather than research, testing, facts, or data to support his conclusions.

Finally, the Court concludes Pratt lacks the requisite expertise to offer his proffered opinions.  Pratt testified in his Iowa deposition that he would not classify himself as an

expert in air drying systems and that he has never testified as an expert in any air drying systems.  *See* Ex. 1 at 161:24-162:4; *see also Id.* at 21:14-17 (has never given testimony as an expert to evaluate any other air drying system).  *See* Ex. 3 at 190:6-191:6.  When asked in this case what changed since his last deposition when he testified he could not testify as to most Dr. Sokhansanj issues, Pratt testified that he had the opportunity to review depositions and documents.  *Id.*  Moreover, Pratt has had little experience with Cyclonic Drying Systems, drying of MSW, and serving as any type of expert in this field.  Pratt has never evaluated a cyclonic drying system that involved MSW, nor has he ever viewed a Sebright VSI or PAD System in person.  *Id.* at 52:8.  Pratt has no specialized training or education specific to air drying systems, MSW processing, drying rates, and performed no modelling and has never modeled any other airdrying system that dried MSW.  *Id.* at 51:20-25; 39:13-22; 39:23-40:25; 42:3-8.

Defendants offer Pratt's expertise for his "comments" on plaintiff's expert's report without employing a sound methodology to reliably show that his conclusions are valid and accurate.  Having failed to do that, the Court concludes defendants did not meet their burden to demonstrate such opinions are admissible under Federal Rule 702, *Daubert*, and its progeny.  Rather than assist the jury, the Court believes Pratt's opinions would only serve to confuse the jury.  For all the above reasons, Plaintiff's motion to exclude the testimony of Michael D. Pratt is granted.

## CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that the Joint Motion to Exclude Certain Opinions of Plaintiff's Expert, Nathiel Egosi **(Doc. 498) is DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Exclude Expert opinion of Designated Expert Witness Michael Pratt **(Doc. 512) is GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Exclude Expert opinion of Designated Expert Witness Stephen Simmons **(Doc. 514) is GRANTED in part and DENIED in part.**

**IT IS FURTHER ORDERED** that defendants' motion for oral argument on *Daubert* motions filed by the parties **(Doc. 534) is DENIED.**

**IT IS FURTHER ORDERED** that defendants' motion for a status/scheduling conference **(Doc. 542) is GRANTED.   An in-person status conference and oral argument on plaintiff's motion to enforce the Court's order and for sanctions is set for Wednesday, July 20, 2022 at 9:00 a.m. in the courtroom of the undersigned**.  **All counsel must appear in person.**

**IT IS FURTHER ORDERED** that the parties' motions for leave to file documents under seal **(Docs. 547, 549) are GRANTED**.


_____/s/ David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on June 14, 2022.